## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

KEVIN HURST GILL

VERSUS

MICHAEL J. ASTRUE,
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

CIVIL ACTION

NO. 10-615-JJB-CN

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

Signed in chambers in Baton Rouge, Louisiana, February 9, 2012.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

KEVIN HURST GILL

VERSUS

MICHAEL J. ASTRUE,
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

CIVIL ACTION

NO. 10-615-JJB-CN

**MAGISTRATE JUDGE'S REPORT**

Plaintiff, Kevin Hurst Gill, seeks judicial review of a final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. In making that final decision, the Administrative Law Judge (ALJ) reached the fourth step of the five-step sequential disability analysis set forth in 20 C.F.R. § 416.920(b)-(f),[1] and found that plaintiff had the residual functional capacity (RFC) to perform his past relevant work as a sprinkler system irrigator and protective signal installer. (Tr. 71.) Plaintiff has filed a Memorandum in Support of Appeal and Motion for Summary Judgment. The appeal is opposed and plaintiff has filed a reply memorandum. (Dkt. #s 11, 13, and 14, respectively.)

---

[1] Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).

## FACTS AND PROCEDURAL HISTORY

On January 5, 2007, plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Insurance benefits alleging that he became disabled on July 7, 2006, due to a brain injury, neck fracture, arm fracture, and seizures resulting from injuries sustained in an automobile accident on that date, and also loss of sight in his left eye. (Tr. 140-46, 184.) In a letter to the ALJ dated March 16, 2009, plaintiff informed the ALJ that he was amenable to amending his onset date until after his 50th birthday, i.e. February 2, 2007. Plaintiff again brought this change up at the July 16, 2009 hearing. Therefore, plaintiff has amended his alleged disability onset date to February 2, 2007, the date he attained age 50. (Tr. 10, 206.) Plaintiff's applications were denied at the initial level and again upon reconsideration. (Tr. 57-60.) Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ). (Tr. 73.) Plaintiff appeared on three different hearing dates before ALJ Michael S. Hertzog, spanning from June 2008 to July 2009. (Tr. 6-56.)[2] On August 21, 2009, the ALJ issued a decision in which he found that plaintiff was not disabled under the Social Security Act. (Tr. 63-72.) The ALJ found that plaintiff met the insured status requirements of the Social Security Act through March 31, 2011, and had not engaged in substantial gainful activity since July 7, 2006, the initial alleged onset date. (Tr. 65, Findings 1 and 2.) While the ALJ found that plaintiff had severe impairments of an odontoid fracture (broken neck) and a left ulnar shaft fracture sustained in the motor vehicle accident, he found that neither of these impairments or a combination of his other impairments met or

---

[2] The dates of the Hearings were June 11, 2008, January 14, 2009, and July 16, 2009.

medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 66, Findings 3 and 4.) The ALJ then assessed plaintiff's residual functional capacity (RFC) and found that he was able to perform light work, with the following limitations: occasionally lift up to 100 pounds and frequently lift up to 10 pounds; could frequently carry up to 10 pounds and could occasionally carry up to 50 pounds, and could never carry greater than 50 pounds; could sit, stand, and walk each for 4 hours at one time; could sit for a total of 8 hours out of an 8-hour workday; could stand and walk each for 4 hours out of an 8-hour workday; could occasionally reach and occasionally push and pull with the upper extremities; would be restricted from climbing ladders, ropes and scaffolds; could occasionally climb ramps and stairs and balance; could occasionally be exposed to unprotected heights and moving mechanical parts; and could occasionally operate a moving vehicle and be exposed to heat, humidity, wetness, temperature extremes, and vibrations. (Tr. 66, Finding 5.) Given this RFC, the ALJ found that plaintiff was capable of performing his past relevant work as a sprinkling system irrigator and a protective signal installer. The ALJ found that this work did not require the performance of work-related activities precluded by the plaintiff's RFC. (Tr. 71, Finding 6.) Because the plaintiff could perform his past relevant work, the ALJ, therefore, found plaintiff not disabled. (Tr. 71, Finding 7.) On July 27, 2010, the Appeals Counsel denied plaintiff's request for review leaving the ALJ's decision as the final administrative decision in this case. Plaintiff timely filed the instance civil action, which is now before the Court.

## **ANALYSIS**

Judicial review of a final decision of the ALJ denying disability insurance benefits and supplemental security income benefits is limited to two inquiries: (1) whether there is substantial evidence in the record as a whole to support the ALJ's findings, and (2) whether the ALJ applied the proper legal standards.[3] In applying the "substantial evidence" standard, the Court must carefully scrutinize the record to determine if, in fact, substantial evidence supporting the decision exists, but the Court may not reweigh the evidence in the record, nor try the issues de novo, nor substitute its judgment for the ALJ's even if the evidence preponderates against the ALJ's decision.[4] Substantial evidence means more than a scintilla, but less than a preponderance, and is such relevant evidence as a reasonable mind might accept to support a conclusion.[5] A finding of "no substantial evidence" will be made only where there is a conspicuous absence of credible choices or an absence of medical evidence contrary to the claimant's position.[6]

The burden of proof in disability administrative hearings rests predominately on the plaintiff, and toward that end, the plaintiff and the ALJ conduct a five-step analysis.[7] Only if the plaintiff proves that he is no longer able to work in his past relevant work does the burden shift to the Commissioner to establish that the plaintiff nonetheless has the ability to

---

[3] Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

[4] Id.

[5] Richardson v. Perales 402 U.S. 389, 401 (1971).

[6] Johnson v. Bowen 864 F.2d 340, 343-44 (5th Cir. 1988).

[7] Brown v. Apfel, 192 F.3d 492, 497-498 (5th Cir. 1999).

engage in other substantial gainful activity.[8] This case was decided at step four, and the burden of proof rested squarely on plaintiff to prove he could not return to his past relevant work.[9]

Plaintiff, however, argues that the decision should be reversed, or in the alternative, remanded for a new hearing, and states the following errors:

1. The ALJ erred in not forwarding written questions to the ME as requested;

2. The ALJ erred in not giving proper weight to the report of the ME, Dr. Stephen Wilson;

3. The ALJ erred in not giving proper weight to the treating physician report of Dr. Richard Rathbone; and

4. The ALJ erred in not giving proper weight to the amendment of the onset date to the 50th birthday of plaintiff and thus approaching advanced age.[10]

---

[8] Rivers v. Schweiker, 684 F.2d 1144, 1155-1156 & n.14 (5th Cir. 1982).

[9] Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)(per curiam).

[10] Plaintiff's brief at p. 4.

**MEDICAL EVIDENCE**

The medical evidence of record indicates that plaintiff was injured in an automobile accident on July 7, 2006. He was admitted to Our Lady of the Lake Regional Medical Center for supportive care.[11] An examination of plaintiff revealed an old type-2 odontoid fracture and a closed head injury. Plaintiff went into a coma, and was in a coma for a week. Repeated CT scans of the head, however, did not reveal any worsening of his condition. When plaintiff came out of his coma, he was transferred to the floor where he received physical, occupational and speech therapy, which were noted to be working. A rehabilitation consultation was performed by Dr. Martin A. Langston on July 14, 2006. Dr. Langston's impression at that time was gait instability and impaired self-care skills; closed head injury; an old C2 odontoid fracture; history of hypertension, cognitive impairment, and history of polysubstance abuse. Dr. Langston noted that the plaintiff was waxing and waning in his participation in occupational therapy. Dr. Langston wanted plaintiff to participate more consistently before considering rehabilitation placement. Claimant was discharged on July 21, 2006, and was transferred to re-hab with instructions to follow-up in one month. Plaintiff had not had any surgical procedures performed and had made a gradual, slow progress in his post-traumatic recovery. (Tr. 238-288.)

On July 24, 2006, plaintiff was admitted to Lane Regional Medical Center after falling at his home. He was treated there by Dr. Richard Rathbone who ordered x-rays and referred

---

[11] On admission, it was noted the EMTs had indicated a number of beer cans were found in the plaintiff's vehicle, and a urine drug screen was positive for cocaine. (Tr. 67.)

plaintiff to Dr. Kozar for a consultation for his left forearm because the x-rays demonstrated a mildly displaced fracture of the left distal ulna. (Tr. 322-334.)

Plaintiff was then transferred to Touro Hospital on July 27, 2006 for treatment at the closed head injury rehabilitation center. Plaintiff had been wearing a soft c-collar since July 7, 2006, secondary to the odontoid fracture. Over the course of his stay at the center, plaintiff wanted to remove the collar and move about without assistance, which was noted in the records to be a safety concern. Plaintiff was discharged on August 15, 2006, his condition noted as being good. (Tr. 289-303.)

On September 5, 2006, plaintiff was seen at the Varnado Family Practice Clinic for trouble sleeping due to his neck and arm pain, and was prescribed Soma and Lortab. (Tr. 316-321.)

Plaintiff was presented to the emergency room at Lallie Kemp Medical Center on September 26, 2006, complaining of pain from his left upper extremity. An MRI was ordered and plaintiff was instructed to go to an orthopaedist. Imaging on that date showed a healing distal left ulnar fracture. (Tr. 304-315.)

An MRI of plaintiff's cervical spine was performed on October 11, 2006. The imaging demonstrated an odontoid fracture with posterior angulation; diffuse, broad-based disc bulge associated with posterior and posterolateral osteophytes at C5/6; diffuse, broad-based disc bulge with small central disc herniation at C6/7; as well as posterolateral osteophytes with degenerative hypertrophic changes at C3/4 and C4/5. (Tr. 335-336.)

Plaintiff again presented to the emergency room at Lallie Kemp Medical Center on November 30, 2006, with complaints of chronic pain. Examination indicated a decreased range of motion of the neck and plaintiff was instructed to continue to receive treatment at the pain clinic. (Tr. 304-315.)

There are no other medical records until the residual functional capacity assessment on February 1, 2007, performed by Dr. Charles Lee. (Plaintiff filed his applications for disability on January 5, 2007.) Dr. Lee assigned exertional limitations consistent with the ability to perform light work. Plaintiff was limited in his ability to reach in all directions. No postural, visual, or environmental limitations were assigned. (Tr. 228-235.)

Then, on May 29, 2008, plaintiff was seen by Dr. Rathbone as a "follow-up" visit.[12] Dr. Rathbone opines that plaintiff had sustained a broken neck (odontoid fracture), a fracture of the left forearm, and a closed head injury resulting in a 1-week coma, from an automobile accident on July 6, 2006. Dr. Rathbone wrote that plaintiff had been unable to work since the accident due to chronic headaches and chronic neck pain; he was unable to organize his thoughts and had lost most of his short-term memory. Dr. Rathbone goes on to state that plaintiff's prognosis was poor and he was doubtful that plaintiff would ever be able to work again. He also opined that plaintiff had reached his maximum medical improvement and probably would not progress any further.[13] (Tr. 337-339.)

---

[12] Plaintiff does not provide any medical records from Dr. Rathbone since his treatment at Lane Memorial Hospital on July 24, 2006. Dr. Rathbone submits a one page progress note, along with a letter to plaintiff's counsel.

[13] Dr. Rathbone also commented in his letter to plaintiff's counsel about plaintiff's blindness in his left eye; loss of his long-term memory; chronic insomnia; continuous pain in his left forearm; and, a torn ligament in his left knee.

Plaintiff's disability process continued, and as stated above, plaintiff appeared on three different hearing dates before ALJ Hertzog. The hearing was continued twice by the ALJ in order for plaintiff to undergo a total of four examinations by three consultative examining physicians (CEs): one examination by Stephen W. Wilson, M.D.; two examinations by Benedict E. Idowu, M.D.; and one examination by Paul M. Doty, D.O. These examinations were at the expense of the government and were performed in order to develop the record.

On July 16, 2008, two months after plaintiff was seen by Dr. Rathbone, Dr. Stephen M. Wilson performed a consultative orthopaedic evaluation on plaintiff. Examination of his neck revealed good range of motion with some pain on forward flexion at 20 degrees and some pain to the left shoulder when rotated. There was no evidence of any type of swelling, inflammation or muscle spasm in the cervical spine. Orthopaedic and neurological examination of the upper extremities revealed no evidence of muscle spasm, muscle weakness, or atrophy. There was no gross deformity or decreased range of motion in any of the joints of the upper extremities. While plaintiff complained of some pain on palpation over the dorsum of the left wrist and on palpation over the lateral left deltoid, range of motion in the left wrist and left shoulder were normal when compared to the right. An x-ray of the left wrist demonstrated that the plaintiff had a well-healed fracture to the distal ulna, and the wrist joint was essentially normal. An x-ray of the cervical spine showed the plaintiff had a non-union to the fracture of the odontoid, and degenerative changes throughout the cervical spine area most prominent at C5-6, with some spurring and narrowing of the disc

space.  Dr. Wilson opined that plaintiff's fracture to the left ulna had healed and should not give him any significant problem.  He also indicated that plaintiff should have a fusion between C2 and C3 and found that the odontoid fracture to be so unstable that any future injury would be severe.   Even with this observation, Dr. Wilson opined that plaintiff could return to light duty work and could perform activities where he does not have any chance of having any severe injury to his neck.  Dr. Wilson goes on to state that plaintiff needs to return to activities that require only occasional bending, stooping or crawling, and no climbing.  He could lift up to 30 pounds occasionally and 10 pounds regularly. (Tr. 69, 340-350.)

A neurological evaluation was then ordered by the ALJ, and plaintiff was seen by Dr. Ben E. Idowu, D.O. on July 24, 2008.  The examination was unremarkable for any focal motor or sensory deficits of functional significance.  Cognitive examination was also intact.  Vision loss in the left eye was noted.  Dr. Idowu opined that plaintiff's ability to understand, remember, and carry out instructions was not affected by his impairment.  Dr. Idowu also found that plaintiff's ability to interact appropriately with supervisors, co-workers and the public, and changes in routines were not affected by his impairments.  While he did find that plaintiff had some degree of memory disturbance that might affect his ability to learn new and complex information, it would not affect his activities of daily living.  Dr. Idowu saw plaintiff again on February 12, 2009, and the examination was essentially unchanged and revealed no functional motor, sensory, or cognitive deficits. (Tr. 351-357 and Tr. 358-568.)

Finally, the ALJ arranged a second consultative orthopaedic evaluation.  This time, by Dr. Paul M. Doty, which took place on February 5, 2009.  Dr. Doty noted that plaintiff

was not taking any medications and had a negative surgical history for his odontoid and ulnar shaft fractures. Upon examination, Dr. Doty found that plaintiff had a restricted range of motion of his neck. He forward flexed 35degrees nearly touching his chin to his chest, extended 13-14 degrees, side bended 15 degrees to the right and left, and rotated 70 degrees to the right and 75 degrees to the left. Plaintiff had good strength to grip with both hands, good strength to both biceps and triceps. Plaintiff had no sensory defect to pinprick of his upper extremities and no measurable atrophy. He had full pronation and supination of his left arm and full extension and flexion of his wrist. Further, examination indicated plaintiff had full range of motion of his right and left shoulders with some discomfort to abduction at 160 degrees bilaterally more related to shoulder discomfort. Plaintiff was observed to walk with a normal gait. Dr. Doty opined that plaintiff appeared to have resolved from his odontoid and left forearm fractures. He indicated the claimant had residual soreness in his neck, but appeared to be neurologically intact, and would benefit from light duty employment without repetitive extending of his arms or craning of his neck. He, like Dr. Wilson, indicated the plaintiff's left arm injury was fully resolved. (Tr. 376-377.)

Dr. Doty completed a medical source statement indicating that plaintiff had the ability to occasionally lift up to 100 pounds and frequently lift up to 10 pounds; occasionally carry of to 50 pounds and frequently carry up to 10 pounds; sit, stand, and walk each for 4 hours at one time; sit for a total of 8 hours in an 8-hour workday; and stand and walk for a total of 4 hours each in an 8-hour workday. He restricted plaintiff from climbing ladders and scaffold and limited the plaintiff to occasional climbing of ramps and stairs and balancing

and frequent stooping, kneeling, crouching, and crawling. He also limited plaintiff to occasional exposure to unprotected heights, moving mechanical, parts, operating a motor vehicle, humidity and wetness, extreme heat and cold, and vibrations. (Tr. 369-375.)

**Error 1.    The ALJ erred in not forwarding the examining physicians additional questions regarding their findings.**

The ALJ obtained the additional examinations at the government's expense in order to develop the record since plaintiff did not seek sufficient medical treatment. The Court agrees with defendant commissioner that an ALJ is not required to badger the examining sources with questions merely because the physicians unanimously issued opinions that failed to support a finding of disability. Further, the ALJ explained to plaintiff's counsel at the last hearing why it was unnecessary to submit additional questions to the examiners, and addressed each of plaintiff's counsel's questions individually. The ALJ explained:

ALJ: Looking at this now, your March 12th letter, both doctors identify the restrictions they would place on your client, so I don't know what purpose is served by your first questions, because that's exactly what they did do. They did not recommend surgery so – and it's not their job one way or the other, so that takes care of question 2. Question 3, again they would be said so, and on Item 4 of your questions if any were noted they would have – they're supposed to note that, so I don't see any harm. Now your other questions – amended onset date and then – so what – that's the same thing on your other questions. They're supposed to note that and would note that if that were the case. And they didn't note that in either – none of the CEs have. You had three different doctors and not a single doctor has. Do you have a – anything from a treating physician that says that he needs further surgery?

ATTY: Your Honor, I had the letter from the treating physician, Dr. Rathbone. It was introduced at that very first hearing.

It should be noted that the letter by Dr. Rathbone that counsel is referring to does not suggest surgery. Dr. Rathbone's letter, in fact, states that plaintiff had reached his maximum medical improvement and probably will not progress any further. (Tr. 338.)

The Fifth Circuit has held that an ALJ has discretion in ordering a consultative examination, although the evidence in a given case may mandate such examination.[14] Here, plaintiff did not seek sufficient medical treatment and the ALJ found it necessary to order the additional examinations. The ALJ plainly met his burden to develop the record. Further, a review of the decision and the medical evidence set forth above, shows that the ALJ properly developed the record to the extent that there was sufficient medical evidence to make an informed decision, and the ALJ fully explained at the last hearing that these physicians had already answered plaintiff's questions in their reports. Therefore, the Court agrees with the defendant and finds that plaintiff's argument is without merit.

---

[14] *See, e.g.* Haywood vv. Sullivan, 888 F.2d 1463, 1472(5th Cir. 1989.)

**Error 2.    The ALJ did not give proper weight to the report of Dr. Wilson.**

Plaintiff cites to Dr. Wilson's report and argues, "Clearly, a claimant who needs a cervical fusion and has an unstable odontoid fracture cannot return to a medium duty job, or any job."[15] This is the extent of plaintiff's argument and the Court rejects this argument for want of adequate briefing and medical support.[16] The Court further points out that while Dr. Wilson indicated that plaintiff needed cervical fusion and had an unstable odontoid, he did not suggest that plaintiff return to, or was capable of performing, any medium work. To the contrary, Dr. Wilson, in spite of indicating that plaintiff needed surgery, opined that plaintiff could perform work comfortably within the exertional range of light work.  This finding supports the ALJ's finding that plaintiff retained the RFC for performing light work. (Tr. 66.)[17] Plaintiff does not point to any medical evidence, other than the above sentence, to support his claim that the ALJ did not give proper weight to Dr. Wilson's opinion.  Again, to the contrary, the ALJ's RFC determination is supported by Dr. Wilson's findings. Therefore, the Court finds that the ALJ gave the proper and appropriate weight to Dr. Wilson's report.

---

[15] Plaintiff's Memorandum, p. 7.

[16] *See*, Perez v. Barnhart, 415 F.3d 457, 462 n.4(5th Cir. 2005); Robinson v. Guar. Trust Life Ins. Co., 389 F.3d 475, 481 n.3 (5th Cir. 2004) (rejecting a claimant's argument for want of adequate briefing.)

[17] The regulations describe "light work" as jobs involving lifting no more than 20 pounds occasionally, lifting or carrying up to 10 pounds frequently, and a good deal of walking or standing or sitting most of the time without pushing or pulling of arm or leg controls.  20 C.F.R. §§ 404.1567(b), 416.967(b).

**Error 3.      The ALJ did not give the proper weight to the report of Dr. Rathbone.**

Plaintiff claims that Dr. Rathbone was his treating physician for "many years;" however, plaintiff had return to Dr. Rathbone only once since his July 2006 accident, and the ALJ duly noted this fact. The regulations provide that a physician who has a history of only intermittent, infrequent treatment arguably lacks the detailed, longitudinal perspective of his patient's condition that would qualify him as a "treating physician."[18] The ALJ also discounted Dr. Rathbone's opinion because he found that the limitations assigned by Dr. Rathbone were based upon the claimant's own complaints and not on clinical and laboratory diagnostic techniques, and that his opinion was inconsistent with the other substantial medical evidence, such as the three consultative examining physicians. The Fifth Circuit has held that the ALJ has the sole responsibility for determining a claimant's disability status and that "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."[19] Further, treating physician's opinions are not conclusive and can be assigned little or no weight when good cause is shown.[20] The Court's function is to review whether the ALJ's decision is supported by substantial evidence, not to independently reweigh the evidence and consider whether it would rule as the ALJ did. Here, the ALJ rejected Dr. Rathbone's opinion because the evidence supported a contrary conclusion, and

---

[18] *See*, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

[19] Newton v. Apfel, 209 F.3d 448, 455-456 (5th Cir. 2000) citing Paul v. Shalala, 29 F.3d 208, 211 (5th Cir. 1994).

[20] "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.", Id., citing Brown v. Apfel, 192 F.3d 492, 500 (5th Cir. 1999); Greenspan v. Shalala , 38 F.3d 232, 237 (5th Cir. 1994).

there is simply no evidence that suggests he is impaired to the extent indicated in Dr. Rathbone's May 30, 2008 letter to his counsel. Therefore, the ALJ was proper in rejecting Dr. Rathbone's opinion.

**Error 4.     The ALJ did not give the proper weight to his amended onset date.**

Plaintiff amended his onset date to February 2, 2007, the date he attained age 50. Under the SSA, a claimant at age 50 would be judged as a claimant approaching advanced age. Plaintiff implies that under the Medical-Vocational Guidelines (Grid Rules), he would be found disabled as of February 2, 2007, because he would be considered a claimant approaching advanced age. As defendant points out, plaintiff's argument is without merit for two reasons. First, the ALJ decided this case at step four and not at step five, which would have invoked the use of the Grid Rules. Second, even if the ALJ had decided the case at step five, applied the Grid Rules, and assumed an RFC for sedentary work, the applicable Grid Rule under that hypothetical scenario would still result in a finding of "not disabled," because plaintiff had a high school education and a skilled work background, thus rendering the issue of transferability of skills irrelevant.[21]  Indeed, even if plaintiff were limited to sedentary work under that hypothetical scenario, two of the three potentially applicable Grid Rules would result in a finding of "not disabled."[22]

Further, plaintiff undermines his claim of disability due to injuries he sustained from an automobile accident on July 7, 2006, by amending his alleged disability onset date to

---

[21] *See* 20 C.F.R. Part 404, Subpart, P, Appendix 2, Table No. 2, Rules 202.14-15.

[22] *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 1, Rules 201.15-16.

February 2, 2007. This is more than six months after his accident where he sustained his alleged injuries and nearly one month after he filed his disability application. (Tr. 140.) Therefore, the Court finds that this argument is without merit and that amending the onset date was merely a ploy to try to get disability based on "advanced age" while disregarding the fact that all three examining physicians' reports ultimately support the ALJ's residual functional capacity assessment that plaintiff is capable of performing a wide range of light work.

Accordingly, the Court finds that there is substantial evidence in the record to support the ALJ's decision and that the ALJ followed the proper legal standards in finding that plaintiff is capable of performing his past relevant work, and is thus not disable.

## RECOMMENDATION

Therefore, it is recommended that the ALJ's decision be affirmed and that the plaintiff's appeal be dismissed, with prejudice.

Signed in chambers in Baton Rouge, Louisiana, February 9, 2012.

**MAGISTRATE JUDGE CHRISTINE NOLAND**